NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0078n.06

Case No. 22-3052

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | **FILED**<br>Feb 08, 2023<br>DEBORAH S. HUNT, Clerk |
| JANE DOE, an individual known to all parties moving to proceed under a pseudonym, et al., | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO AT CLEVELAND |
| v. | ) ) ) | |
| CITY OF MANSFIELD, OHIO, et al., | ) | |
| Defendants-Appellants. | ) ) | O P I N I O N |

Before: McKEAGUE, WHITE, and MURPHY, Circuit Judges.

**McKEAGUE, Circuit Judge.** This case involves the release of Mansfield Police Officer Jane Doe's personnel file in response to a records request by her workplace-subordinate. Doe's personnel file contained a polygraph report with a brief but graphic admission to prior unnatural sexual behaviors. She alleges the release of this information by the City of Mansfield and David Remy, the City's Human Resources Director, violated her constitutional right to privacy. At summary judgment, the district court denied Remy qualified immunity. Because the right in question was not clearly established, we reverse.

I.

At all relevant times, Plaintiff-Appellee Jane Doe served as a Sergeant in the Mansfield, Ohio Police Department. In this role she supervised Officer Freeman Nixon. Doe and Nixon detail two events that led to the breakdown of their relationship.

First, Doe showed Nixon a picture she received of him with a "humongous penis [drawn] over his . . . body." Doe Tr. R. 51-2, PID # 526; Nixon Tr. R. 51-3, PID # 544–45. Nixon testified that when Doe showed him the picture, it was in "more of a joking manner," rather than out of concern. Nixon Tr. R. 51-3, PID # 545. Doe, for her part, testified that when she showed Nixon the photo, "[h]e laughs, I laugh. He said they're just jealous, end of conversation[.]" Doe Tr. R. 51-2, PID # 526. Nixon did not immediately report the incident, which he describes as sexual harassment.

More contention resulted when, a few months later, Nixon allegedly used department resources to wash his personal vehicle. Doe alleges that she had previously warned Nixon about this behavior, so she wrote him up for insubordination. Nixon, however, felt that Doe "lied on" him in filing this report, because he "was never given a direct order not to wash a car." Upset that Doe appeared to be treating him unfairly, and believing that her report had threatened his employment, Nixon reported Doe for the graphic photograph incident. According to Nixon, he was never updated on the status of this complaint, so after six months he made a public records request for Doe's personnel file.

Defendant-Appellant David Remy received that records request. At the time, Remy, a lawyer admitted to practice in the state of Ohio, served as the Human Resources Director for the

City of Mansfield.[1]  In that capacity, Remy determined whether redactions to personnel files were required before their release.  One week after Nixon made his request, Remy sent him Doe's personnel file.

Doe's personnel file contained a report with answers from a polygraph examination she completed as part of the hiring process for a job with the Ohio Highway Patrol.  She did not ultimately get that job, and years later applied for a position at the Mansfield Police Department.  As part of Mansfield's hiring process, the Department collected an investigative packet that included the report from her prior polygraph examination with the Ohio Highway Patrol.  The report contained admissions by Doe about unwanted sexual advances by a supervisor, theft from a prior employer, driving while under the influence of alcohol, suspension from college due to low grades, and abuse in her relationship with her former fiancé.  At issue in this appeal, however, is a three-sentence statement (*hereinafter* Statement) about Doe's unnatural sexual behavior sometime between the ages of seven and eighteen.  Doe maintains that the behavior described in her Statement occurred as a result of childhood sexual abuse, but she concedes that a reader might not have known as much.

Although Remy reviewed Doe's Statement before releasing her file, he considered it "[j]ust an unflattering incident in her life," part of which may have occurred while she was a minor.  Remy Tr. R. 57-3, PID # 726–28.  Although he recognized that such an incident would be embarrassing, possibly even humiliating, to a person, he ultimately determined that Ohio law did not provide an exception to disclosure.  He did not consider federal privacy law in coming to this conclusion.

---

[1] Remy had occupied that role for seven years, since December 2011.  Prior to that, from 2001 to November 2011, he served as the City Law Director.  And before that, from February 1993 to December 2000, he was the chief prosecutor for the City.

Remy testified that when unusual situations arose in the past, he had consulted the City's Law Department, but he did not consult anyone before sharing Doe's file.

Nixon claims that upon receipt of Doe's file, he became concerned about Doe's fitness for the police force, especially in light of the fact that the Statement arguably relates to a component of Doe's job duties. Nixon showed another sergeant and two officers Doe's personnel file.[2]

When Doe found out about the release of her personnel file and the dissemination of the Statement made in her polygraph report, she left work early and describes the following "six weeks of [her] life [as] a complete blur." Doe Tr. R. 57-4, PID # 752. She also had to tell her husband about the disclosed information for the first time. She suffered from depression, anxiety, and PTSD after the release of the information and sought treatment from two mental health professionals.

Following the release of her personnel file, Doe filed suit against Nixon for false light invasion of privacy and public disclosure of private facts, slander, and intentional infliction of emotional distress. She also sued the City, alleging a Fourteenth Amendment substantive due process privacy claim. Doe later amended her complaint to add privacy claims against Remy, both personally and in his official capacity as the Human Resources Director for the City of Mansfield. Her husband, John Doe, also brought a loss of consortium claim that remains pending.

Doe moved for partial summary judgment on the liability element of her claims. The district court denied her motion. Nixon similarly moved for summary judgment, and the district court granted in part and denied in part his motion. Doe's intentional infliction of emotional

---

[2] There is also evidence that another officer approached Nixon and asked him about the report, and he responded by confirming its contents. After Doe filed suit, Nixon told a civilian friend about the lawsuit and provided her with a copy of Doe's personnel file. He also testified that he told some "close family" an "all inclusive story from the beginning to the end of what happened." R. 43-2, PID # 290, 294–95; R. 57-2, PID # 706–07.

distress claim against Nixon remains pending. Remy and the City also moved for summary judgment. The district court granted summary judgment to Remy in his official capacity but denied summary judgment on the individual capacity claims, finding Remy not entitled to qualified immunity. The district court also denied the City's motion for summary judgment. *Doe v. City of Mansfield*, 577 F. Supp. 3d 651, 678 (N.D. Ohio 2021). Remy and the City noticed this appeal on January 21, 2022.[3]

## II.

We review de novo a district court's denial of qualified immunity on summary judgment, viewing the facts in the light most favorable to the non-moving party. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citations omitted). "Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Accordingly, a government official will be shielded from liability, unless the plaintiff shows: (1) a constitutional violation by defendant; and (2) that the right at issue was "so clearly established that a reasonable official in that position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Id.* (citing *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095

---

[3] At oral argument counsel for Appellants clarified that Appellants seek review "solely [of] the qualified immunity issue with Mr. Remy."

(6th Cir. 1992)). If the right is not clearly established, courts may choose not to reach the constitutional question. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

III.

The right to privacy is twofold. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060 (6th Cir. 1998) (explaining that cases follow "along two distinct lines"). First, there is the right to be free of state interference when making decisions regarding intimate personal matters. *See Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998) (citing *Roe v. Wade*, 410 U.S. 113 (1973)). That right is currently in major flux. *See generally Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (overturning *Roe v. Wade*). But we need not address the status of that privacy right today, because this appeal relies on a separate privacy right, and *Dobbs* is limited to abortion. *Id.* at 2277–78 ("Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion."). The second right is the right to avoid state disclosure of highly personal matters. *See Whalen v. Roe*, 429 U.S. 589, 598–600 (1977).[4]

This second right, the informational right to privacy, concerns "an individual's right to control the nature and extent of information released about [themselves]." *Bloch,* 156 F.3d at 683. We interpret the right narrowly, to "only protect[] citizens from disclosure when the circumstances implicate 'personal rights that can be deemed fundamental or implicit in the concept of ordered liberty.'" *Barber v. Overton*, 496 F.3d 449, 455 (6th Cir. 2007) (quoting *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir. 1981)). If the disclosed information is constitutionally protected, courts must

---

[4] Although untouched by *Dobbs*, the Court also seems to have doubts about this second right. *See Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 146 (2011) ("Since [1976], the Court has said little else on the subject of an 'individual interest in avoiding disclosure of personal matters.'"(citation omitted)); *see also Lee v. City of Columbus*, 636 F.3d 245, 260 n.8 (6th Cir. 2011) ("Whether a broader right to nondisclosure of private information even exists remains an open question under the Supreme Court's recent jurisprudence." (citing *Nelson*, 562 U.S. 134)). But "the Court has not provided us with any reason to take the opportunity to revisit our past precedents on this matter," so we continue to recognize the right. *Lee*, 636 F.3d at 260 n.8.

balance the government's interest in disclosure against the individual's interest in privacy. *Lee v. City of Columbus*, 636 F.3d 245, 259–60 (6th Cir. 2011) (citing *Kallstrom,* 136 F.3d at 1061). The state action must also be narrowly tailored to further the state interest. *Kallstrom*, 136 F.3d at 1064; *see also Jenkins v. Rock Hill Loc. Sch. Dist.*, 513 F.3d 580, 590 (6th Cir. 2008).

This court has identified two categories of constitutionally protected information: (1) information which, upon release, could lead to bodily harm; and (2) information of a sexual, personal, and humiliating nature. *Lambert v. Hartman*, 517 F.3d 433, 440–41 (6th Cir. 2008) (citing *Kallstrom,* 136 F.3d at 1061, and *Bloch*, 156 F.3d at 683). The district court found Doe's Statement was arguably of a sexual, personal, and humiliating nature, and left the final determination of whether the Statement falls into that category for a jury. *Doe*, 577 F. Supp. 3d at 665. The district court also found that the release was not narrowly tailored to serve a compelling government interest. *Id.* at 669. But we need not address those complicated constitutional violation findings in detail because, even if the release of Doe's Statement rises to the level of a constitutional violation, the law was not clearly established.

"A right is 'clearly established' when its 'contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although there does not need to be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curium) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

The district court relied on *Bloch* and subsequent interpretations of *Bloch* in finding Doe's privacy right clearly established. *See Doe*, 577 F. Supp. 3d at 670. However, it is not readily apparent that the holding in *Bloch* extends to the facts established here, such that any reasonable

officer in Remy's place would have understood that releasing the Statement violated Doe's constitutional right to privacy.

First, the plaintiffs in each case are distinct. In *Bloch*, the plaintiff was a crime victim who shared intimate details of her rape with police in order to aid an investigation, then sued the sheriff who released those intimate details to the press. 156 F.3d at 676. Here, in contrast, Doe is a state employee who willingly disclosed the information as part of a job application.

Second, the circumstances surrounding the two disclosures differ significantly in nature. In *Bloch,* the victim and her husband participated in interviews that led to news outlets publishing critical stories about the sheriff. *Id.* The sheriff held a press conference in response to these stories, at which he unnecessarily released "'highly personal and extremely humiliating details' of the rape suffered by Ms. Bloch." *Id*. at 676, 686 ("[A] rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penological purpose is being served."). Here, on the other hand, Remy released Doe's personnel file in response to a facially legitimate public records request. And the Statement released, though sexual in nature, could conceivably be deemed pertinent to Doe's fitness as an officer.

But most importantly, this case is distinguishable from *Bloch* because *Bloch* was not a public records case, therefore it involved no comparable state interest in disclosure. "Where state action infringes upon a fundamental right, such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest." *Id.* at 686 (quoting *Kallstrom,* 136 F.3d at 1064). But courts must

balance "the government's interest in disseminating the information against the individual's interest in keeping the information private." *Lee*, 636 F.3d at 260 (citations omitted).

In *Bloch*, the details of the plaintiff's rape were released in retaliation for criticizing the sheriff; there was "no [other] justification." *Bloch*, 156 F.3d at 686. So, the balance was straightforward; the state had no interest in disclosure, and the victim had a constitutional interest in keeping the information private. Easy win for the plaintiff.

But here, unlike the absence of a state interest in disclosure in *Bloch*, there is a compelling state interest in disclosure of public records. The Ohio Public Records Act requires the state to make "public records" available upon request. Ohio Rev. Code § 149.43(B)(1). This requirement "shed[s] light on the state government's performance, thereby enabling Ohio citizens to understand better the operations of their government." *Kallstrom*, 136 F.3d at 1064–65 (citing *State ex rel. Strothers v. Wertheim,* 684 N.E.2d 1239, 1242 (Ohio 1997)); *see also Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 570, 574 (6th Cir. 2002). Indeed, such a requirement will "expose government activity to public scrutiny, which is absolutely essential to the proper working of a democracy" because "[s]crutiny of public records allows citizens to evaluate the rationale behind government decisions so that government officials can be held accountable." *State ex rel. Fair Hous. Opportunities of Nw. Ohio v. Ohio Fair Plan*, 184 N.E.3d 952, 964 (Ohio 2022) (citations omitted); *see also Welsh-Huggins v. Jefferson Cnty. Prosecutor's Off.*, 170 N.E.3d 768, 786 (Ohio 2020) ("A primary purpose of Ohio's public-records act is to enable the public to see how our government agencies work, whether good or bad."); *State ex rel. Hogan Lovells U.S., L.L.P. v. Ohio Dep't of Rehab. & Corr.*, 179 N.E.3d 1150, 1167 (Ohio 2021) (Kennedy, J., concurring in part and dissenting in part) ("Public records are one portal through which the people

observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance." (citation omitted)).

And to support that compelling purpose, the Supreme Court of Ohio has "[t]ime and time again" explained that the Public Records Act "must be construed liberally in favor of broad access, and any doubt should be resolved in favor of disclosure of public records." *Strothers*, 684 N.E.2d at 1241. Ohio courts have also held that reports from polygraph examinations completed by police officers for employment purposes constitute public records subject to disclosure. *See State v. Schimmel*, 85 N.E.3d 774, 788–89 (Ohio Ct. App. 2017); *State ex rel. Lorain J. Co. v. Lorain*, 621 N.E.2d 894, 896–97 (Ohio Ct. App. 1993); *see also State ex rel. Multimedia, Inc. v. Snowden*, 647 N.E.2d 1374, 1378–79 (Ohio 1995).[5]

*Bloch* did not involve the tension that exists here between state law seemingly requiring disclosure and a constitutional right to privacy. And the *Bloch* court explained that in situations where the state *does* have an interest in disclosure, the balance changes. *Bloch*, 156 F.3d at 686 ("If the details were released in connection with a trial, for example, the compelling state interest in prosecuting a criminal would almost certainly outweigh the Blochs' privacy interest."). Additionally, because Ohio law seemingly requires disclosure, it is harder to say that Remy violated a clearly established right. *Cf. Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016) ("The Supreme Court tells us that public officials should generally receive qualified

---

[5] Unfortunately, it seems as though police officers are told otherwise. *See Kallstrom*, 136 F.3d at 1059–60 ("Prior to accepting employment with the City, the plaintiffs were assured by the City that personal information contained in their files would be held in strict confidence. Despite its earlier promise of confidentiality, however, the City believed Ohio's Public Records Act required it to release the officers' files upon request from any member of the public." (internal citations omitted)). Doe's report contains the following disclaimer: "This examination was conducted with the understanding that the results would be confidential as guided by the rules under the Ohio Public Records Law." It is also labeled "CONFIDENTIAL."

immunity when enforcing properly enacted laws."); *but see id.* at 442 ("The Supremacy Clause 'invalidates state laws that interfere with, or are contrary to, federal law.'" (citations omitted)).

But we have addressed the tension between a state law requiring disclosure and the constitutional right to privacy. *See Kallstrom*, 136 F.3d at 1064 (citing *Strothers,* 684 N.E.2d at 1242); *see also Overstreet*, 305 F.3d at 570, 574 (evaluating a county disclosure policy). In *Kallstrom*, the defendant city similarly believed it was required to disclose police officer records under the Ohio Public Records Act. *See Kallstrom*, 136 F.3d at 1064. Explaining that the Ohio Public Records Act requires disclosure of records "to shed light on the state government's performance, thereby enabling Ohio citizens to understand better the operations of their government," we assumed that disclosing state records was a compelling state interest. *Id.* at 1065. But even though there was a compelling interest, this court determined that the disclosure was not narrowly tailored because it did not exclude certain personal information, [6] the disclosure of which put the officers and their families at risk:

> While there may be situations in which the release of [] this type of personal information might further the public's understanding of the workings of its law enforcement agencies, the facts as presented here do not support such a conclusion. The City released the information at issue to defense counsel in a large drug conspiracy case, who is asserted to have passed the information onto his clients. We simply fail to see how placing this personal information into the hands of the *Russell* defendants in any way increases public understanding of the City's law enforcement agency where the *Russell* defendants and their attorney make no claim that they sought this personal information about the officers in order to shed light

---

[6] The following information was released:

> officers' addresses and phone numbers; the names, addresses, and phone numbers of immediate family members; the names and addresses of personal references; the officers' banking institutions and corresponding account information, including account balances; their social security numbers; responses to questions regarding their personal life asked during the course of polygraph examinations; and copies of their drivers' licenses, including pictures and home addresses.

*Kallstrom*, 136 F.3d at 1059.

on the internal workings of the Columbus Police Department. We therefore cannot conclude that the disclosure narrowly serves the state's interest in ensuring accountable governance. Accordingly, we hold that the City's actions in automatically disclosing this information to any member of the public requesting it are not narrowly tailored to serve this important public interest.

*Id*.

Here, if the City's interest in disclosure is to allow citizens to evaluate the rationale behind government decisions so that government officials can be held accountable, then removing information that potentially relates to a police officer's fitness to perform her job arguably defeats the purpose of the disclosure.[7] Based on these significant distinctions from *Bloch*, we find that the law was not clearly established in this case.

After Remy released Doe's Statement, the Ohio Supreme Court issued an opinion that seems to approve of such a disclosure. *State ex rel. Summers v. Fox* dealt with a records request for a video recording of a sexual battery victim's witness-interview. 169 N.E.3d 625, 638–39 (Ohio 2020). The Ohio Supreme Court required release of the video, arguably in violation of the victim's right to privacy under *Bloch*. But the court found *Bloch* inapplicable because:

> *Bloch* is not a public-records case, and it did not create the categorical exception to disclosure under federal law required by R.C. 149.43(A)(1)(v). *See*, *e.g.*, *State ex rel. ESPN, Inc. v. Ohio State Univ.*, 132 Ohio St.3d 212, 2012-Ohio-2690, 970 N.E.2d 939, ¶ 25 (the Family Educational Rights and Privacy Act, 20 U.S.C. 1232g, which requires schools receiving federal funds to keep sensitive student information confidential, is a prohibition on the release of records). As a result,

---

[7] The district court found the release of Doe's Statement not narrowly tailored, in part because Remy did not ask Nixon not to share the Statement with anyone else and Remy did not "even consider" allowing Nixon to inspect the document without copying it. *Doe*, 577 F. Supp. 3d at 661, 669. But these potential restrictions on use of the information miss the mark. Either the information is *private* or it is not. If the state discloses the information, even if it takes one or both of these measures, then Nixon knows about the arguably sexual, personal, and humiliating information; it is no longer private.

> J.K. and the county have failed to show that federal law prohibits disclosure of the witness-interview video recordings.

*Id.* at 638. It is unclear how *Summers* should be read.

If *Summers* is properly read as explaining that the only "federal law" that requires nondisclosure is that law which is specifically codified by the legislature, it overlooks *Kallstrom.* 136 F.3d at 1065. This Court has made it clear that the Ohio Public Records Act yields to the Fourteenth Amendment.

But it is also possible that the Ohio Supreme Court was interpreting *Bloch* and found it inapplicable based on *Summers*' facts. Such an interpretation would lend credence to our determination today that the law is not clearly established in this case, because we are hesitant to hold Remy to a higher standard than the state's supreme court. *Cf. Melton v. Phillips*, 875 F.3d 256, 268 (5th Cir. 2017) (en banc) (Costa, J., concurring in the judgment) ("Such a conflict in the caselaw will support an easy defense of qualified immunity. . . . [I]t is hard to imagine that any immunity threshold should hold law enforcement to a higher standard than judges when it comes to interpreting the law.").

Although there is a broad general proposition stemming from *Bloch* about protecting sexual, personal, and humiliating information, the facts alleged here are so distinguishable from that case that it would not be clear to a reasonable official that Doe's Statement was exempt from disclosure under the Ohio Public Records Act. *See Reichle v. Howards*, 566 U.S. 658, 665 (2012). The right at issue was thus not clearly established. This conforms with our narrow interpretation of the right to privacy. *See Barber v. Overton*, 496 F.3d 449, 450–51, 455 (6th Cir. 2007) (interpreting *Kallstrom* narrowly); *see also Dobbs*, 142 S. Ct. at 2247–48 ("[W]e must . . . exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected

by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

IV.

We REVERSE the district court's judgment.